**ROBERTSON & ASSOCIATES, LLP**
Alexander Robertson, IV (SBN 127042)
  *arobertson@arobertsonlaw.com*
Mark J. Uyeno (SBN 189063)
  *muyeno@arobertsonlaw.com*
32121 Lindero Canyon Road, Suite 200
Westlake Village, California 91361
Telephone (818) 851-3850 • Facsimile (818) 851-3851

**WHITFIELD BRYSON & MASON**
Daniel K. Bryson (*Pro Hac Vice* pending)
  *dan@wbmllp.com*
Patrick M. Wallace (*Pro Hac Vice* pending)
  *pat@wbmllp.com*
900 W. Morgan Street
Raleigh, North Carolina 27603
Telephone (919) 600-5000 • Facsimile (919) 600-5035

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA YNEZ VALLEY UNION HIGH SCHOOL DISTRICT, a political subdivision of the State of California; <br><br> Plaintiff, <br><br> vs. <br><br> FIELDTURF USA, INC., a Florida corporation; FIELDTURF, INC., a Canadian corporation; FIELDTURF TARKETT SAS, a French corporation, <br><br> Defendants. | Case No. 17-cv-1214 <br><br> **COMPLAINT FOR:** <br><br> 1. **BREACH OF THIRD PARTY BENEFICIARY CONTRACT;** <br> 2. **BREACH OF IMPLIED WARRANTY;** <br> 3. **VIOLATION OF THE UNFAIR COMPETITION LAW (BUSINESS & PROFESSIONS CODE § 17200, *ET SEQ.*);** <br> 4. **VIOLATION OF THE FALSE ADVERTISING LAW (BUSINESS & PROFESSIONS CODE § 17500, *ET SEQ.*);** <br> 5. **FRAUDULENT CONCEALMENT;** <br> 6. **DECLARATORY RELIEF;** <br> 7. **BREACH OF EXPRESS WARRANTY** <br><br> **DEMAND FOR A JURY TRIAL** |

/ / /

/ / /

ROBERTSON
& ASSOCIATES, LLP

22737.1

COMES NOW, Plaintiff, SANTA YNEZ VALLEY UNION HIGH SCHOOL DISTRICT, a political subdivision of the State of California (hereinafter the "District"), by its undersigned attorneys, and alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters based upon its investigation conducted by and through its attorneys, which include, among other things, review and analysis of the court filings, websites, and investigative journalist reports.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after reasonable opportunity for discovery.

## INTRODUCTION

1.      This action involves the deceptive and unfair business practices of FieldTurf in connection with its manufacturing, marketing, sale and installation of a defective artificial turf sports field installed in September of 2006 at Santa Ynez Valley Union High School, located at 2975 East Hwy 246, Santa Ynez, California (hereinafter "SYHS").  Between 2005 and 2012, FieldTurf sold and installed approximately 1,700 artificial turf fields throughout the United States, which generated reported revenues of $570,000,000.  Unfortunately for its customers, the fibers that FieldTurf used to make its artificial turf was defective – and FieldTurf knew it.  Despite this knowledge, FieldTurf continued to aggressively market and advertise the benefits of its defective product, and even replaced and repaired fields which had prematurely deteriorated with the same defective product.

2.      In 2011, FieldTurf sued its supplier of the artificial fibers, TenCate Thiolon Middle East, LLC. ("TenCate") for fraudulent inducement of contract, breach of contract and breach of warranty alleging that the turf fibers supplied to FieldTurf were defectively manufactured without "an adequate amount of ultraviolet (UV) stabilizers required to prevent loss of tensile strength, increasing its premature disintegration during the warranty period." In that lawsuit, FieldTurf admitted that it had "built more than 100 fields using defective fibers that are degrading

prematurely." FieldTurf sought relief because it faced "pending and future claims of tens of millions of dollars as a result of failures of [the] supplied fiber."  FieldTurf settled its $30 million lawsuit against TenCate in 2014 for a confidential amount, but failed to inform its customers, including Plaintiff herein, of its knowledge that it had installed defective fibers in Plaintiff's artificial turf sports field.  Instead, FieldTurf pocketed the settlement and kept Plaintiff and the rest of its customers in the dark and on their own to deal with the cost of replacing their deteriorating fields.

## THE PARTIES

3.      Plaintiff is now, and at all times mentioned herein was, a public school district duly organized and existing under Chapter 1 of Division 3 of Title 2 of the *California Education Code* and is thus a political subdivision of the State of California.  The District is the legal owner of the real property where FieldTurf installed its artificial turf sports field at SYHS. As such, the District is the current owner of the defective field installed by FieldTurf and is responsible for its maintenance and repair.

4.      Defendant, FIELDTURF USA, INC. ("FieldTurf"), is a Florida corporation with its principal place of business in Calhoun, Georgia, doing business in California and elsewhere in the United States.  FieldTurf sold and installed the artificial turf field at SYHS which is the subject matter of this action.  Plaintiff is further informed and believes, and thereon alleges, that FieldTurf manufactured the artificial turf field installed at SYHS at its Calhoun, Georgia plant.

5.      Defendant, FIELDTURF, INC. ("FTI"), is a Canadian corporation, and sister corporation of FieldTurf.  Plaintiff is further informed and believes, and thereon alleges, that Defendant, FTI may be the manufacturer of the artificial turf fields installed at SYHS.

6.      Defendant, FIELDTURF TARKETT SAS ("FTS"), is a French corporation, and the parent corporation of both FieldTurf and FTI, and thus, liable for the actions of both FieldTurf and FTI.  Plaintiff is further informed and believes,

ROBERTSON
& ASSOCIATES, LLP

1    and thereon alleges, that Defendant, FTS may be the manufacturer of the artificial

2    turf fields installed at SYHS.

3        7.    Defendants, FieldTurf, FTI and FTS are collectively referred to herein

4    as "FieldTurf."  FieldTurf manufactures and installs artificial turf sports fields, and

5    claims that it has completed more the 2,500 such installations throughout the world.

6                        **JURISDICTION AND VENUE**

7        8.    This Court has original and/or supplemental subject matter jurisdiction

8    over all claims in this action pursuant to 28 U.S.C. §§ 1332 and 1367.  Diversity

9    jurisdiction exists because this is a dispute between citizens of different states and in

10   which citizens of foreign states are additional parties.  The amount in controversy,

11   exclusive of interest and costs, well exceeds $75,000.

12       9.    This Court has personal jurisdiction over the parties in this action by

13   the fact that Defendants are corporations that are authorized to conduct business in

14   California and have intentionally availed themselves of the laws and markets of

15   California through the promotion, marketing, distribution and sale of its artificial

16   turf products to high schools, colleges, universities and municipalities in California,

17   including Plaintiff herein.  Defendants sold and installed the defective artificial turf

18   field at SYHS in the County of Santa Barbara, State of California.

19       10.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b),

20   because a substantial part of the events or omissions giving rise to the Plaintiff's

21   claims occurred in this District. Venue is also proper under 18 U.S.C. §1965(a),

22   because Defendants transacted a substantial amount of its business in this District.

23                        **STATEMENT OF FACTS**

24   A.    **FieldTurf And Its Artificial Turf Product:**

25       11.   According to its website (www.fieldturf.com) FieldTurf is recognized

26   as the market leader globally in synthetic sports fields.  FieldTurf boasts that 21 out

27   of the 32 National Football League teams have selected FieldTurf installations for

28   their stadiums and/or practice fields.

12.    The main components of each FieldTurf field are artificial monofilament grass fibers, a permeable fabric backing into which the fibers are stitched or "tufted", and a mixture of sand and rubber granules that serve as the "infill" between the fibers.



13.    FieldTurf obtained the artificial fibers for the turf field it installed at SYHS from TenCate. These fibers were marketed by Tencate under the brand name "Evolution" and manufactured at Tencate's facility in Dubai, United Arab Emirates. At all relevant times, FieldTurf marketed the turf which used the artificial Evolution grass fibers under the brand name "Duraspine" (the "Defective Product").

14.    Commencing in 2005, FieldTurf embarked upon an aggressive marketing campaign to promote its new Duraspine monofilament artificial grass turf, which was more expensive than traditional slit film fiber fields sold by its competitors. As part of its marketing campaign, FieldTurf made the following representations in a marketing brochure:

/ / /

/ / /

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



### 10 Reasons Why FieldTurf And Its MonoGrass System Should be Selected

#### 1. MONOFILAMENT FIBERS—DURABILITY AND VALUE

In the last few years, FieldTurf has focused on new products that have all the best attributes of traditional PE slit film yarns, with the added *durability* that is only possible with the monofilament production process. FieldTurf's efforts have resulted in a patented fiber unavailable to any other company.

FieldTurf's new "DuraSpine" MONOFILAMENT fiber offers INCREASED PRODUCT LIFE. Comparative wear testing shows a wide gap in wear resistance between standard, proven slit film fibers (including FieldTurf's own slit film, which has a proven 8-10 year life cycle) and this new generation of "true" monofilament. Although at this point it is impossible to correlate this additional toughness to a set period of extended product life, the fact remains that the new FieldTurf system will last longer.

*And the longer a product lasts, the more economical it is from a life cycle standpoint! Buying FieldTurf with the new MONOFILAMENT, regardless of initial price, is a BETTER VALUE.*

This added longevity will actually allow the District to amortize the life of the field on a 10+ year basis rather than the 8+ year life expectancy. This represents a much greater return on investment than the older slit film products currently being installed by most companies in the market. FieldTurf has in place over 40 MONOFILAMENT applications in North America, including fields at the NCAA Division I level. No other company has this kind of fiber or such proven fields in place.

#### 2. MONOFILAMENT FIBERS—PLAYABILITY AND AESTHETICS

FieldTurf's new-generation monofilament system is the closest thing yet to a grass-like surface.

- The fibers have excellent "memory" so they remain looking like new grass—erect fibers, not a matted carpet.
- The erect fibers offer "resistance" to soccer balls, making the system more grass-like—the ball rolls and plays exactly like it does on grass according to FIFA testing—and thus is more useful for soccer players.
- The fibers, though more durable, are quite soft, which will virtually eliminate skin abrasions.

#### 3. COMPLETE PRODUCT QUALITY CONTROL

23    15.    In another marketing handout, FieldTurf claimed that "DuraSpine fiber

24   is far more resistant to UV and foot traffic", "this spine gives each fiber unmatched

25   'memory' and thus resistance to matting" and "Tests indicate the DuraSpine fiber is

26   far more resistant to UV and foot traffic, the two main enemies of any turf system."

27   / / /

28   / / /

16.     FieldTurf aggressively marketed the financial advantages of its product based upon its represented longevity:



**B.     FieldTurf Knew Evolution Fibers Were Defective:**

17.     FieldTurf knew that its representations about the durability and longevity of its Defective Product were false and likely to deceive its customers, including Plaintiff herein, based upon its knowledge of the Evolution fibers' failures beginning as early as 2006.

/ / /

/ / /

/ / /

/ / /

ROBERTSON
& ASSOCIATES, LLP

22737.1                                          7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case 4:11-cv-00050-TWT   Document 392-4   Filed 03/13/13   Page 4 of 9

| From: | Kenny Gilman |
|---|---|
| Sent: | Monday, February 27, 2006 10:20 AM |
| To: | Jim Petrucelli |
| Cc: | Darren Gill; John Gilman; Troy Squires |
| Subject: | RE: Torrey Pines |
| Attach: | Westview HS Jan. 19 2006.doc; _0119171609_001.pdf |

Jim,

Scope attached for same repair at Westview HS. Total cost about 100k including all materials and labor.

Kenny

-----Original Message-----
From: Jim Petrucelli
Sent: Monday, February 27, 2006 12:40 AM
To: Kevin Reynolds; Kenny Gilman; Troy Squires; Sportech: Jim; Sportech: Steve; John Gilman
Cc: Darren Gill; tcfieldturf@cox.net
Subject: RE: Torrey Pines

Kevin & Kenny,

What is the current thought process as to how we correct these problems and what is causing the failure???... who is taking the point and resolving the failure and how quickly can we get it done???...I understand that there are other similar failures... Jim M & Tim Coury need to identify all the existing problems as well as any potentials.. Sprinturf will try everything to exploit this field... Darren needs to be involved and cover the marketing with a proactive public response and spin...

-----Original Message-----
From: Tim Coury [mailto:tcfieldturf@cox.net]
Sent: Sunday, February 26, 2006 2:00 PM
To: Kevin Reynolds; Kenny Gilman; Jim Petrucelli; Troy Squires; Sportech: Jim; Sportech: Steve; John Gilman
Subject: Torrey Pines
Importance: High

I met Mike Mirante (FieldCare West) today while he swept Torrey Pines High. The lite green panels have failed like all the other all green fields in S. Calif. This field is 2 years old and the lite green fiber looks 6 years old. Torrey Pines is the sister school to La Costa Canyon High. La Costa will install a field and track this summer and will decide between us and Sprint very soon. The Torrey field is killing our chances of getting the La Costa order. Sprint is bringing everyone to the Torrey field and saying it is proof that the FT fiber doesn't last. We better do something to correct this or S Cal will suffer. No question.

Confidential                                                                FT00064043

18.    Further, in an angry email to FieldTurf's founder, John Gilman, dated May 12, 2006, the president of Sportexe, Inc., a general contractor which installed FieldTurf's Duraspine at high schools and colleges throughout Southern California, said, "…it does not look good to prospects and clients, spinning it, that its normal for the fiber to fall out of the field….Right now, on our [name of field redacted] in So Cal. before we take prospects there we have to get FieldTurf Builders there to

sweep the fiber that is how bad it is.  Donny has a new field north of Seattle and before he shows prospects he has to arrive early and pick up the fiber everywhere…I would rather lose this selling advantage than have to try to explain why our fiber is so easily pulled out of our fields."

19.    In response to these alarming reports, John Gilman emailed Jeroen van Balen, then the Managing Director of Mattex Leisure Industries (the original manufacturer of the Evolution fibers and predecessor of TenCate) on December 28, 2006, "We are seeing fields showing splitting after under a year of play and have already had to replace one full-sized field due to yarn failure after only a few months of installation!"  In response, van Balen wrote an email back to Gilman reiterating that the monofilament fiber sold to FieldTurf was "excellent".  However, John Gilman responded on December 30, 2006, "Telling me the technology is excellent means nothing.  Now we know with heavy use, the fiber is coming apart. What do we do? If I write an official letter, it will have a material effect on the deal. The deal with explode in many directions.  We'd better talk."  On New Year's Eve of 2006, John Gilman followed up with the ominous warning, "It's all about that old story of waiting for the next shoe to drop.  We have had a few failures as you know. The question is…will many others fail?  Who knows?"

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

20.    On or about December 27, 2006, John Gilman prepared the following letter to Jeroen van Balen[1]:



From the desk of John Gilman, CEO

Mattex Leisure Industries
Mr. Jeroen van Balen
PO Box 112470
Dubai, United Arab Emirates

Dear Jeroen,                                                                     December 27, 2006

As we have been reviewing the proposed 2007 contract, a few points have come up that must be brought to the forefront. Mattex has made some changes in the resin formulation of the Evolution yarn earlier this year to produce a stronger, more resilient product - XR Evolution - however, I understand that the XR product has shipped sparingly only to Europe. I have recently been made aware of the replacement of the le Plessis Rombason field in France due to yarn failure. I understand that this was replaced from the originally installed first version of Evolution with the Saudi resin to the XR version made with the Dow resin. Why has Mattex not made a change to all the Evolution yarn delivered to Fieldturf Tarkett for the stronger XR Evolution?

We have a fiduciary responsibility to be aware of any future claims. Should we expect to have to replace more of these first version Evolution fields? The cost to replace a field is approximately $3.00/sqf USD plus the removal and dumping costs. With over 700+ fields in the ground already with Evolution, and if a fifth of these fields already installed failed, the possible claim could be upwards of $35 million to replace them! Is the current pricing structure putting any reserve in place for this possibility?

There are currently a number of fields installed in Europe and the US that are starting to show wear and yarn splitting after less than a year in the ground, we need to have some assurance from Mattex that there is a plan and sufficient reserve in place to address any future claims for at least the next 24 months.

We must have this issue addressed prior to the execution of the 2007 contract. I await your response.

Sincerely,

John Gilman
CEO, Fieldturf Tarkett

**FieldTurf Tarkett**
UNITED IN SPORT

tel. (514) 2-b-9311 ext. 100  (800) 724-2969 | fax. (514) 904-0533 | john.gilman@fieldturftarkett.com | 8088 Montview, Montreal, Quebec Canada H4P 2L7

Confidential                                                                     FT00296583

---

[1] Obtained from public domain from article published by NJ Advance Media, The 100-Yard Deception at wbur.org

21.     On November 9, 2007, an internal email Kenny Gilman, the Executive Director of FieldTurf, told Kevin Reynolds, Vice President of FieldTurf's Operations, and David Moszkowski, Chief Financial Officer and Interim CEO after John Gilman's death:

Case 4:11-cv-00050-TWT    Document 527-5    Filed 04/11/14    Page 2 of 3

| From: | Kenny Gilman <kgilman@fieldturf.com> |
|---|---|
| Sent: | Friday, November 9, 2007 10:03 AM |
| To: | Kevin Reynolds <Kevin.Reynolds@fieldturftarkett.com>; David Moszkowski <David.Moszkowski@fieldturftarkett.com> |
| Subject: | Directives from legal department to salespeople and marketing department |

David / Kevin,

As you know our sales and marketing guys continually make claims that we can't possibly meet in the real world. This opens us up to tons of exposure from a legal standpoint. For example drainage claims by our salespeople currently have blown up in our face and there's pending lawsuits and 100's of thousands in holdbacks outstanding due to the fact that the fields can't possibly drain as fast as the sales guy's claim they will. On the marketing side the claims made regarding the Duraspine and Hard / Soft fiber are ridiculous. Everyday we are putting stuff out there that can't and won't live up to the marketing spin. We have to control this somehow!!!

Thanks
Kenny

CONFIDENTIAL                                        GILMAN-TEN000102

22.     In his deposition in the Tencate Action, Kenny Gilman testified that he knew and objected to "many marketing and selling tactics" made by FieldTurf's sales force, including the ads and representations that FieldTurf used ten pounds per square foot of infill on every field, which Mr. Gilman admitted was a false representation.

ROBERTSON
& ASSOCIATES, LLP

22737.1                                    11

23.     In July 2007 after his father's death, Ken Gilman arranged a trip to New Jersey to educate FieldTurf's interim CEO, David Moszkowski, about the problems with the Defective Products. Gilman summarized the results of this fact-finding trip saying fields installed in 2005 and 2006 and subjected to only one or two years of play were becoming matted.  "This yarn is nowhere near as robust or resilient as we initially thought and probably will not last that must longer than a high quality slit-film yarn. In all likelihood in years 5 and 6 these Duraspine fields will be matted down and fibrillating pretty heavily. Our marketing claims and sales pitches need to reflect this reality."

24.     Notwithstanding the knowledge that its product was defective, FieldTurf failed to change its marketing and advertising claims for the Defective Products.

25.     As further evidence of FieldTurf's knowledge that it had sold defective artificial turf fields to thousands of customers, including Plaintiff herein, on March 1, 2011, FieldTurf sued Tencate in United States District Court, *FieldTurf USA, Inc. v. Tencate Thiolon Middle East, LLC*, Case No. 4:11-CV-50-TWT (N.D. Georgia) ("Tencate Action").  In its lawsuit, FieldTurf accused Tencate, and its predecessor Mattex, of a "bait-and-switch" scheme in which Mattex and later Tencate changed its formula to make the Evolution fibers and also changed the manufacturing process which resulted in a much less expensive, less durable fiber that also lacked an adequate amount of ultraviolet ("UV") stabilizers required to prevent loss of tensile strength, increasing the fiber's premature disintegration during the warranty period. In the Tencate Action, FieldTurf's own expert concluded that the Evolution fibers did not live up to its supplier's warranty that the fibers would retain more than 50% of their tensile strength during their expected 10 year life and that those fields which had not already failed would likely fail in the future.

26.     Further, internal emails between Denise Mireault, FieldTurf's Director of Customer Service, and FieldTurf executives in November and December of 2009,

1  reveal discussions about the list of "bad" Duraspine fields which were failing at that

2  time, including Baker University in Kansas, Bishop Verot High School in Florida,

3  and Midlothian High School in Texas. Significantly, these internal emails stated that

4  the Duraspine turf which had been installed at SYHS came from the same

5  production lots of turf which had been installed and were failing at Bishop Verot

6  and Midlothhian High Schools.  Thus, as of December 2009, FieldTurf executives

7  knew that the Duraspine turf installed at SYHS came from the same production lots

8  of turf which were failing at others schools across the country.  At no time did

9  FieldTurf ever inform Plaintiff of these material facts before, during or after

10  Plaintiff made complaints to FieldTurf about its failing field.

---

Case 4:11-cv-00050-TWT   Document 454-18   Filed 09/30/13   Page 1 of 4

From:       Bearden, Derek <Derek.Bearden@fieldturftarkett.com>
Sent:       Monday, December 7, 2009 8:31 AM
To:         Slaughter, Janice <Janice.Slaughter@fieldturftarkett.com>
Subject:    FW: Fabric/Yarn Info OnSummer Green

Janice,

Below are some fields (you may already have some of these) that have the same dye lots of yarns we've see issues with.
We should try to find at least one of each color/dye lot and put it in the QUV to see what happens.

Derek

From: Bennett, Jennifer
Sent: Saturday, December 05, 2009 3:41 PM
To: Bearden, Derek; Mireault, Denise
Cc: Waters, Brian
Subject: RE: Fabric/Yarn Info OnSummer Green
Importance: High

Hi Derek,

Here are a handful of fields that used the same lots of Summer Green DL 205WR1A1 (same as Baker U):

 • Central College SO# 56491 – 5/2006
 • James Madison University SO# 56385 – 6/2006
 • West Chester University SO# 56706 - 07/2006
 • New Fairfield HS SO# 56710 - 7/2006
 • Bishop Sullivan SO# 56877 – 8/2006
 • Riverside Brookefield HS SO# 56805 – 8/2006

Summer Green DL 205WR2A1 (same as Midlothian and Bishop Verot):

 • City of Fontana SO# 56270 – 4/2006
 • Pittsburg HS SO# 56360 – 4/2006
 • Dwight Englewood School SO#56347 – 4/2006
 • Ygnacio Valley HS SO 55780 – 5/2006
 • Raritan HS SO# 56442 – 5/2006
 • Wagner College SO# 56812 – 7/2006
 • Santa Ynez HS SO#56805 – 8/2006
 • Riverside Brookefield HS SO# 56805 – 8/2006
 • Mahwah HS SO# 56791 – 8/2006
 • War Memorial HS (New Jersey) SO# 57003 - 9/2006
 • Monterey Peninsula College SO# 56834 – 9/2006

Here are a handful of fields that used Fieldgreen DL 206WR5A14 (same as Midlothian):

 • Goose Creek ISD SO# unknown (job # GCREEK) 4/2006
 • Missouri State University SO# 56276 – 4/2006
 • Pittsburg HS SO # 56360 – 4/2006
 • City of Fontana #5 SO# 56270 – 5/2006
 • Corsicana ISD SO# 56460 – 5/2006 (Denise – isn't this the one on our current list to?)
 • Raritan HS SO# 56442 – 5/2006
 • Catholic University of America – SO# 00076 – 5/2006

Confidential                                                                    FT00195082

27.     Despite FieldTurf's knowledge that the Evolution fibers installed at SYHS were defective, FieldTurf concealed this material information from Plaintiff, and even used the same defective Evolution fibers to make repairs in 2010 and to replace the entire field in 2012, without telling Plaintiff that FieldTurf was using the defective turf to make those repairs or replacement.

28.     FieldTurf's massive scheme to defraud consumers such as Plaintiff herein was finally exposed in December 2016 by two investigative reporters at NJ Advance Media after a six month long investigation, which included forty public records requests, examining 5,000 pages of company records, emails, court filings in the Tencate Action and interviewing dozens of coaches, officials and current and former FieldTurf employees.

**C.     SYHS Turf Field:**

29.     In or about the Fall of 2005, Ken Fredrickson, the Athletic Director for SYHS, met with Tim Coury, FieldTurf's Regional Sales Representative, to discuss SYHS using FieldTurf's Duraspine turf product for its upcoming sports complex project.  FieldTurf was one of the companies which had expressed an interest in submitting a bid to install the artificial turf field at SYHS's new sports complex. During meetings with Mr. Fredrickson, Tim Coury told Mr. Fredrickson that the Duraspine turf product had a useful life of 10+ years, and would last beyond the 8 year warranty period.  Mr. Fredrickson and others at the District researched FieldTurf's product and reviewed FieldTurf's marketing brochures concerning the Duraspine turf product. Based upon these representations made by Tim Coury and those contained in the marketing brochures provided to the District, the District selected FieldTurf's Duraspine for the construction of its new sports complex.

30.     On or about June of 2006, the District entered into a prime contract with Granite Construction Company ("Granite") for the construction of certain improvements at SYHS, including the Santa Ynez Union High School Sports Complex Project (hereinafter the "Project").

31.     On or about June 9, 2006, Granite entered into a subcontract with FieldTurf USA, Inc. (hereinafter the "Granite Subcontract"), whereby FieldTurf agreed to sell and install approximately 87,598 square feet of artificial turf sports field for the Project using the Duraspine monofilament turf in exchange for payment of $544,836.40.  In that subcontract, FieldTurf agreed to provide an 8 year, pre-paid, third party insured warranty, permanent football markings (white turf), permanent soccer markings (yellow turf), end zones and midfield logo among other items.  In the Granite Subcontract, FieldTurf warranted to the District that "all Work shall be performed in a neat, skillful, good and workmanlike manner and shall be fit for its intended use both as to workmanship and materials." Further, FieldTurf agreed to assume all obligations, liabilities and responsibilities that Granite had assumed toward the District in the prime contract. FieldTurf also agreed to indemnify the District against all "claims, debts, demands, damages, consequential damages, liabilities, interest, actual attorney's fees, costs and expenses of whatever kind or nature" "in connection with or incident to the Work or arising out of any failure of Subcontractor to perform any of the terms and conditions of this Subcontract…." Finally, FieldTurf also agreed to name the District as an additional insured under its comprehensive general liability insurance policy. A true and correct copy of this Granite Subcontract is attached hereto as Exhibit "A". The Project was completed in or about September of 2006.

32.     In late 2009, SYHS noticed that the colored fibers which made up the school's logo at centerfield and white and orange markings in the end zones was failing.  These failures included breaking, splitting and thinning of the individual fibers characterized by fibrillation, fiber breakage and pile layover, just as FieldTurf had described the Defective Product in its internal emails and in its Complaint in the TenCate Action.

/ / /

/ / /

33.     In or about late September 2009 (three years into the warranty period), Ken Fredrickson reported the foregoing problems to Tim Coury at FieldTurf and made a claim under the warranty to replace the entire field.  In June of 2010, FieldTurf only agreed to replace the turf in both end zones and the logo in the center of the field, and refused to replace the rest of the field. At that time, FieldTurf representatives told the District that the rest of the field did not need to be replaced. FieldTurf concealed from Plaintiff that it knew the Duraspine product was defective and had failed at other schools around the country.  SYHS did not know of these facts and relied upon FieldTurf's expertise to determine whether the entire field needed to be replaced. At no time did FieldTurf ever inform Plaintiff or SYHS that it knew that the Duraspine turf installed at SYHS in 2006 came from the same production lots of turf which had failed at other schools across the country when it refused to replace the entire field in 2010.

34.     In or about May of 2011 in response to further complaints from SYHS that the entire field was prematurely deteriorating, Tim Coury and Martin Olinger of FieldTurf conducted a site inspection of the field at SYHS.  During that inspection, Coury and Olinger told Ken Fredrickson that while FieldTurf had experienced some issues at other schools due to the defective Duraspine turf, FieldTurf would replace SYHS's field with an improved version of Duraspine called "Duraspine Pro" at no cost to the District.  However, in a subsequent letter to SYHS, dated May 11, 2011, Martin Olinger, Senior V.P. of Sales for FieldTurf, told SYHS that it had three options for the replacement of the defective field.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

ROBERTSON
& ASSOCIATES, LLP

22737.1

16

35.   On June 20, 2011, Mr. Olinger sent another letter to SYHS, which again changed FieldTurf's replacement offer and stated, "Based upon pending litigation with the manufacturer of the earlier version of Duraspine used on your current field, we must revise our previous offer and options for replacement…." This letter only offered to replace SYHS's defective field with either an improved version of the original Duraspine turf product, or replace it with "FieldTurf Revolution", which was FieldTurf's new proprietary turf product which it manufactured itself.  The option to replace SYHS's defective field with the new Revolution product was offered at a "discounted" $125,000 "upcharge" according to this letter.  Again, FieldTurf did not disclose that the replacement Duraspine product was defective.

**FieldTurf**
A Tarkett Sports Company

June 20, 2011

Nicole Evenson
Business Manager
Santa Ynez Valley Union High School District

Thank you for your continued patience as it relates to the field issues you have experienced at Santa Ynez. Please let this serve as confirmation of our agreement to replace the current field with a new surface, including previous agreed upon in-lays and logos. This replacement is under the terms of your warranty agreement which was issued at the time of purchase and this warranty remains in effect with its original terms.

We discussed the field replacement options available to Santa Ynez during my visit as well as improvements that have been made to the Duraspine system. In addition to the Duraspine system we have also begun producing our own fiber system called Revolution which offers the most advanced resiliency and wear of any fiber available today.

Based on pending litigation with the manufacturer of the earlier version of Duraspine used on your current field, we must revise our previous offer and options for replacement to the following:

1. **Fieldturf Duraspine 2.5 inch** - Original Duraspine design but with improved polymer, 36 oz face weight, 3- layer 9.2 lb in-fill system, porous finger coated backing. Current warranty remains in effect. **NO CHARGE.**
2. **Fieldturf REVOLUTION 2.5 inch** - Best Polymer, new "ridged" blade design which eliminates weak points and improves resiliency, 40 oz face weight, 3-layer 9.2 lb in-fill system, porous finger coated backing. New 8 year insured warranty from the date of install. **$175K UPCHARGE.**

Based on our previous commitments and the issues you have experienced with your current field, we are offering only to Santa Ynez a further discount on the Revolution upgrade option where the upgrade charge would be $125K.

We will need a 4 week window in early 2012 in order to complete the work.

Let me know if I can provide any additional information. Please let us know of your decision as soon as possible so that a sales agreement and field layouts can be forwarded for approvals.

Marty Olinger

Senior Vice-President, Sales

FIELDTURF, USA        175 N INDUSTRIAL BLVD, NE        CALHOUN, GA  30701
(706) 625-6533        WWW.FIELDTURF.COM

36.    On or about September 8, 2011, the District sent a letter to Mr. Olinger informing FieldTurf that the District had selected the "no charge" option to have its field replaced with the improved Duraspine turf product. That letter also emphasized the need to have the field replaced by the end of 2011 in order not to interfere with the upcoming sports schedules.  Based upon FieldTurf's letter above, the District believed that its field would be replaced with an improved version of the original Duraspine product, which had "an improved polymer".

37.    On or about October 26, 2011, FieldTurf sent a letter to SYHS informing the school that the replacement of the field would not occur until the

1  following year, and also stated that FieldTurf would not replace the end zones or

2  center field logo, contrary to the promise to replace these sections of the field made

3  in Mr. Olinger's letter, dated June 20, 2011.

4      38.    In May of 2012, FieldTurf replaced the defective field at SYHS.

5  However, FieldTurf did not replace the alternating light and dark green turf which

6  had been originally installed at five yards intervals, because FieldTurf claimed that

7  the light green colored fibers were no longer available.  FieldTurf also refused to

8  replace the end zones in May of 2012.   At the time FieldTurf replaced SYHS's

9  field, Tim Coury gave Mr. Fredrickson the handout below titled, 'Top 10 Reasons

10  Why FieldTurf is the Only Choice".  This handout represented, "Our spined fiber,

11  long renowned for its durability and resistance to matting, is coupled with the latest

12  in polymer technology.  This patented combination delivers perfectly natural

13  characteristics and the softest, most durable fiber ever introduced."  This handout

14  further represented, "Since its inception, FieldTurf has proven to be the most

15  durable and longest-lasting synthetic turf system in the marketplace having installed

16  more fields that are currently 8 years or older than all other competitor installations

17  combined."  In support of this representation, this handout included a bar chart

18  identifying the number of fields in daily use which were 9 and 10 years old.  This

19  handout further boasted that the cost of FieldTurf's product was less compared to a

20  grass field over a "10-year period". Based upon these representations, the District

21  believed that the replacement turf had an expected useful life of at least eight years

22  or more.

23      39.    Based upon information and belief, the Duraspine turf product which

24  FieldTurf used to replace SYHS's field was not "improved" but the very same

25  Defective Product which FieldTurf had originally installed in 2006.  FieldTurf

26  installed this very same defective product as the "replacement" field at SYHS just

27  two months after it sued Tencate alleging that the Duraspine turf product was

28  defective and would prematurely degrade and deteriorate.  FieldTurf knew that this

ROBERTSON
& ASSOCIATES, LLP

22737.1                                    19

product was defective and had failed at multiple other high schools and colleges around the country.  FieldTurf concealed this fact from SYHS when it replaced its field with the same defective product. Instead, Mr. Olinger represented in his May 11, 2011 letter that the replacement options available to SHYS included "improvements that have been made to the Duraspine system."  Mr. Olinger's June 20, 2011 letter also represented that the replacement option selected by SYHS included the "Original Duraspine design but with improved polymer".  Based on these representations, SYHS believed the replacement field did not include the defective product. However, these representations were not true and FieldTurf simply replaced the field in 2012 with the same defective product it installed in 2006.   The replacement field began to deteriorate approximately two years after it was installed, or in or about 2014.

40.     The replacement turf installed by FieldTurf in 2012 was defective, has prematurely failed and now must be completely removed and replaced with a non-defective turf field at substantial expense to the District.

## ESTOPPEL FROM PLEADING THE STATUTE OF LIMITATIONS

41.     All conditions precedent for Plaintiff's claims are satisfied and Plaintiff's claims are within the applicable statute of limitations for the claims presented hereunder because Plaintiff did not discover the defect, and could not reasonably have discovered the defect due to Defendant's concealment of material facts. .

42.     Defendants are estopped from relying on any statutes of limitation or repose by virtue of their acts of concealment.

43.     Defendants had a duty to disclose that the Defective Product was defective, not durable, and inherently flawed in manufacture.

44.     Plaintiff had no knowledge of, and no reasonable way of discovering, the defects found in Defendants' Defective Product at the time they purchased the product or before its replacement.

45.     Defendants did not notify, inform, or disclose to Plaintiffs and Class members that there were defects in the Defective Product prior to marketing, selling, or installing the Defective Product at SYHS. Because Defendants failed in their duty to notify Plaintiff that their product was defective, the statute of limitations should be tolled on Plaintiff's claims.

46.     Pursuant to the doctrine of Equitable Tolling and/or Equitable Estoppel, the period for bringing claims shall not be barred due to the statute of limitations or statute of repose. The interest of justice requires equitable tolling in this case. In applying this doctrine the relevant factors include the claimant's diligence, the claimant's knowledge of the relevant facts and whether these statements misled the claimant. Accordingly, with respect to each and every cause of action and/or Count asserted herein, Plaintiff expressly pleads Equitable Tolling and/or Equitable Estoppel and their application thereto.

## FIRST CAUSE OF ACTION

### (Breach of Third Party Beneficiary Contract by Plaintiff Against Defendant FieldTurf USA, Inc.)

47.     Plaintiff repeats and re-alleges each and every allegation contained in preceding paragraphs as if fully set forth herein.

48.     The Granite Subcontract identified the District as an intended beneficiary of the obligations, liabilities and responsibilities FieldTurf undertook on the Project.  As an example, as part of the Granite Subcontract, FieldTurf warranted to the District that its work on the Project would be performed in a skillful, good and workmanlike manner and be fit for its intended purpose as to both workmanship and materials.  Additionally, as part of the Granite Subcontract, FieldTurf agreed defend and indemnify and save harmless the District from any and all claims, debts, demands, damages, consequential damages, liabilities, actual attorney's fees, costs and expenses of whatever kind or nature arising out of FieldTurf's work or failure to perform the terms of the subcontract. FieldTurf also agreed to provide the District

ROBERTSON
& ASSOCIATES, LLP

with an 8 year, pre-paid, third party insured warranty for the turf field it installed on the Project.

49.    The District was the intended beneficiary of the aforementioned promises contained in the Granite Subcontract, which was made expressly for the benefit of the District as part of the construction of the Project.

50.    As part of the Granite Subcontract, FieldTurf issued a written warranty to the District, which provided in relevant part:

> "FieldTurf USA warrants that if FieldTurf FTOM 1F for football/soccer synthetic turf proves to be defective in material or workmanship, resulting in premature wear, during normal and ordinary use of the Product for the sporting activities set out below or for any other uses for which FieldTurf gives its written authorization, within 8 years from the date of completion of installation, FieldTurf will, at FieldTurf's option, either repair or replace the affected area without charge, to the extent required to meet the warranty period (but no cash refunds will be made)."

51.    The written warranty formed the basis of the bargain between FieldTurf and the District at the time of sale of the Defective Product.

52.    Defendant, FieldTurf USA, Inc. breached the aforementioned duties by (1) failing to furnish and install an artificial turf sports field that was free from defects in workmanship and materials; (2) the artificial turf was not fit for its intended purpose; (3) failing to indemnify the District from all debts, damages and expenses arising from its work; and (4) failing to honor its written warranty.

53.    Plaintiff has not yet completed its investigation of all of the problems that may exist with respect to FieldTurf's product and will amend this Complaint at such time as the exact sum becomes certain, or will conform to proof at the time of trial if additional damages are discovered.  Such breaches have proximately caused damage to the artificial turf football field at SYHS.

54.    As a direct and proximate result of the breaches by Defendant, Plaintiff has suffered damage to its real property, loss of use of its football and soccer field, costs to investigate these damages, costs to replace the defective field, attorneys' fees and other economic and special damages all in an amount of at least $500,000.

1   Because Plaintiff's damages are continuous and progressive over time, Plaintiff will

2   seek leave to amend its Complaint at such time as the exact amount of its damages

3   become certain, or will conform to proof at the time of trial.

4   <u>**SECOND CAUSE OF ACTION**</u>

5   **(Breach of Implied Warranties By Plaintiff Against All Defendants)**

6   55.    Plaintiff repeats and re-alleges each and every allegation contained in

7   the preceding paragraphs as if fully set forth herein.

8   56.    Pursuant to California Commercial Code § 2314(1), by placing their

9   product into the stream of commerce, Defendants impliedly warranted that their

10   Duraspine product was merchantable, fit for its intended purpose and suitable for

11   use as an artificial turf sports field.

12   57.    Further, at the time of installing the turf field at SYHS, FieldTurf had

13   reason to know that its Duraspine product would be used as a football and soccer

14   field at SYHS and that the District was relying upon FieldTurf's skill and judgment

15   to furnish suitable products for this particular purpose. Pursuant to California

16   Commercial Code § 2315, FieldTurf impliedly warranted that its Duraspine artificial

17   turf product was fit for this particular purpose.

18   58.    Defendants' artificial turf is not merchantable. In breach of the implied

19   warranties of merchantability and fitness for a particular purpose, the artificial turf

20   field is defective because it physically and chemically degraded prematurely during

21   the first three years for the original field, and in the first 2 years for the replacement

22   field.

23   59.    The artificial turf field was defective when it was sold and installed by

24   Defendants.

25   60.    The defects in the artificial turf were not open and/or obvious to

26   Plaintiff at the time the field was installed by FieldTurf.

27   61.    Any purported disclaimer or limitation of the duration and scope of the

28   implied warranty of merchantability given by Defendants is ineffective, not

conspicuous, unreasonable, unconscionable and void, because Defendants knew or recklessly disregarded that the defects in its artificial turf fields existed and might not be discovered, if at all, until the field had been used for a period of time, and Defendants willfully withheld information about the defects from Plaintiffs.

62.     Defendants received notice that its product was not merchantable by requests by SYHS to repair and/or replace the defective artificial turf field as alleged in paragraphs 34 through 39 above.  Additionally, Defendants knew that its product was defective based upon the internal emails and correspondence to its supplier alleged at paragraphs 18 through 27 above, and its own product testing as alleged in the Tencate Action.

63.     As a direct and proximate result of Defendants' breach of its implied warranties, Plaintiff has been damaged in, *inter alia*, the amount it paid to purchase and replace Defendants' un-merchantable artificial turf field.

## THIRD CAUSE OF ACTION

### (Violation of the Unfair Competition Law, Business & Professions Code § 17200, *et seq*., By Plaintiff Against All Defendants)

64.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

65.     The acts, omissions, and practices of Defendants as alleged herein constituted, and continue to constitute, unlawful and unfair business acts and practices within the meaning of Section 17200 *et seq*. of the California *Business & Professions Code*.  Plaintiff has standing to bring this action under *Business & Professions Code* § 17200 because it has suffered an injury-in-fact and lost money because of Defendants' conduct.

66.     Defendants have engaged in "unlawful" business acts and practices by their violation of the statutes and regulations referenced above, including, but not limited to:  California *Business & Professions Code* § 17200 *et seq*.; California

*Business & Professions Code* § 17500 *et seq*.; and California common law that
prohibits fraudulent concealment and breaches of implied warranty.

67.    Defendants have also engaged in "unfair" business acts or practices in
that the harm caused by Defendants' manufacture, supply, installation, and or
control of its product outweighs the utility of such conduct, and the conduct offends
public policy, is immoral, unscrupulous, unethical, deceitful and offensive, caused
substantial injury to Plaintiff and similar consumers, and provides Defendants with
an unfair competitive advantage over those companies that abide by the law.

68.    Defendants' actions described herein constitute fraud within the
meaning of California *Business and Professions Code* § 17200, *et seq.*, in that
Defendants have failed to disclose that their products contain the defects set forth in
the internal emails and correspondence alleged herein at paragraphs 18 through 27,
and as admitted in the Tencate Action.  Defendants' failure to disclose these defects
was likely to mislead Plaintiff and similar consumers into believing that the products
were free from defects and safe to use.

69.    As a result of the conduct described above, Defendants have been and
will be unjustly enriched at the expense of Plaintiff and similar consumers.

70.    The aforementioned unlawful or unfair business acts or practices
conducted by Defendants have been committed in the past and continue to this day.
Defendants have failed to acknowledge the wrongful nature of their actions.
Defendants have not corrected or publicly issued individual and comprehensive
notices to Plaintiff and other users of their products or provided full restitution and
disgorgement of all ill-gotten monies either acquired or retained by Defendants as a
result thereof, thereby depriving Plaintiff and other users of Defendants' products of
artificial turf that is not merchantable or fit for its intended use.

71.    Pursuant to *Business & Professions Code* § 17203, Plaintiff seeks an
order of this Court requiring Defendants to disgorge all ill-gotten gains and
awarding Plaintiff full restitution of all monies wrongfully acquired by Defendants

by means of such "unlawful" and "unfair" conduct, plus interest and attorneys' fees pursuant to, inter alia, California *Code of Civil Procedure* § 1021.5, so as to restore any and all monies to Plaintiff which were acquired and obtained by means of such "unlawful" and "unfair" conduct, and which ill-gotten gains are still retained by Defendants.  Plaintiff additionally requests that such funds be impounded by the Court or that an asset freeze or constructive trust be imposed upon such monies by Defendants. Plaintiff and other users of Defendants' products may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## **FOURTH CAUSE OF ACTION**

### **(Violation of the False Advertising Law, Business & Professions Code § 17500, *et seq*., By Plaintiff Against All Defendants)**

72.	Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraph as if fully set forth herein.

73.	California *Business & Professions Code* § 17500 prohibits various deceptive practices in connection with the dissemination in any manner of representations that are likely to deceive members of the public to purchase products such as Defendants' artificial turf.

74.	Defendants caused advertisements for their products to be placed in their marketing materials, on their website and in trade publications among other sources, before the general public and knew or should have known that their products did not conform to the advertisements' representations regarding the merchantability of their products.

75.	As a result of the foregoing, Plaintiff and other consumers are entitled to injunctive and equitable relief and damages in an amount to be proven at trial.

/ / /

/ / /

/ / /

# FIFTH CAUSE OF ACTION

## (Fraudulent Concealment By Plaintiff Against All Defendants)

76.    Plaintiff repeats and re-alleges each and every allegation contained in preceding paragraphs as if fully set forth herein.

77.    In order to induce the District to select the Duraspine product, Defendants represented to Ken Fredrickson in 2006 that its Duraspine turf had an expected life of 10+ years, which was consistent with FieldTurf's advertisements of "offers INCREASED PRODUCT LIFE", "the fact remains that the new FieldTurf system will last longer", "This added longevity will actually allow the District to amortize the life of the field on a 10+ year basis rather than the 8+ year life expectancy."  Plaintiff is informed and believes that FieldTurf instructed its salespersons to tell customers that the Duraspine turf product had an expected useful life of 10+ years.

78.    Further, Martin Olinger represented in his May 11, 2011 letter to SYHS that the replacement options available to SHYS included "improvements that have been made to the Duraspine system."  Mr. Olinger's June 20, 2011 letter also represented to SYHS that the replacement option selected by SYHS included the "Original Duraspine design but with improved polymer".

79.    Plaintiff is informed and believes that Defendants knew, or recklessly disregarded the fact that the Duraspine artificial turf originally installed in 2006 and used as the replacement in 2012 was defective based upon the internal emails, correspondence and product testing alleged in paragraphs 18 through 27 above. Further, based upon their own internal investigation, Defendants knew in December of 2009 that the turf installed at SYHS came from the same production lots as the turf installed at Bishop Verot and Midlothian High Schools which had previously failed. Defendants concealed these facts from Plaintiff when FieldTurf refused to replace the entire SYHS field in 2010 and told Plaintiff that the main portion of the field was not defective and did not need to be replaced.

80.    Defendants concealed and suppressed material facts from the District concerning the durability of its Duraspine artificial turf product.  Defendants failed to disclose their knowledge that the Duraspine monofilament fibers would prematurely fade, split, break, and eventually disintegrate within a few years of use.  These omitted and concealed facts were material because they directly impacted the useful life and durability of the product.

81.    Alternatively, Defendants intentionally failed to disclose the fact that the monofilament fibers used in the Duraspine product were defective in that they were not fit for their intended use, a fact known only to Defendants.  Plaintiff could not have discovered this fact through the exercise of reasonable diligence.  Plaintiff is informed and believes that Defendants knew of the durability problems with the artificial turf based upon internal emails, correspondence and testing as alleged in paragraphs 18 through 27 above prior to placing the product into the stream of commerce, and prior to replacing the field at SYHS in 2012 with the same defective product.

82.    Plaintiff reasonably relied upon the Defendants to sell artificial turf sports fields which are merchantable. Defendants knew or ought to have known that Plaintiff relied and/or would have reasonably relied upon Defendants to sell artificial turf fields in which the entire lifetime of the product could be fully used without prematurely becoming damaged or failing.  Defendants' knowledge that its product was not fit for its intended use, combined with the Defendants' knowledge that Plaintiff relied upon Defendants to communicate the true durability, or lack thereof, of its product creates a legal obligation on Defendants' part to disclose to Plaintiff these facts.  Defendants are in a superior position to know the truth about, and the nature of, the durability and useful life of its artificial turf fields.

83.    Defendants intended to deceive Plaintiff by failing to disclose that its artificial turf fields are not fit for their intended purpose, will fail prematurely long before the end of the eight year warranty period, and are not durable.  Defendants

also intended to deceive Plaintiff by replacing the original turf field with the same defective product months after Defendants sued Tencate for producing defective fibers.

84.  Defendants' failure to disclose these facts was material. Plaintiff would not have purchased the original field in 2006 or accepted the replacement of the artificial turf field in 2012 had they known that the Duraspine turf was not fit for its intended use; would prematurely fail long before the end of its ten year expected life, and was not durable.

85.  Plaintiff was harmed.  As a proximate result of Defendants' conduct as alleged herein, Plaintiff will now be required to remove and replace the defective artificial turf field.

86.  Defendants' concealment was a substantial factor in causing Plaintiff's harm.

87.  The wrongful conduct of Defendants, as alleged herein, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious, and/or in conscious disregard for the wellbeing of Plaintiff.  Defendants intended to cause injury to the Plaintiff by placing profits over proving a higher quality product which was represented to the Plaintiff. Defendants engaged and continue to engage in despicable conduct with a willful and conscious disregard of the rights of others. Defendants subjected, and continue to subject, Plaintiff to cruel and unjust hardship. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendants in an amount to deter them from similar conduct in the future.

## SIXTH CAUSE OF ACTION

### (Declaratory Relief Against All Defendants)

88.  Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

/ / /

/ / /

ROBERTSON
& ASSOCIATES, LLP

22737.1

89.     An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties with regard to Defendants' artificial turf supplied and installed at SYHS.

90.     A judicial declaration is necessary and appropriate at this time under the circumstances in order that the parties may ascertain their rights and duties herein.

## SEVENTH CAUSE OF ACTION

**(For Breach of Express Warranty By Plaintiff Against Defendant FieldTurf USA, Inc.)**

91.     Plaintiff adopts and incorporates by reference all foregoing allegations as though fully set forth herein.

92.     Defendant FieldTurf USA, Inc. issued a written "Manufacturer's Limited Warranty" to Plaintiff, which warranted that "if FieldTurf FTOM 1F for football/soccer synthetic turf proves to be defective in material or workmanship, resulting in premature wear, during the normal and ordinary use of the Product for the sporting activities set out below or for any other sues for which FieldTurf gives its written authorization, within 8 years from the date of completion of installation, FieldTurf will, at FieldTurf's option, either repair or replace the affected area without charge, to the extent required to meet the warranty period (but no cash refunds will be made)."

93.     Defendant also represented that Defendants' Duraspine turf field had an expected useful life of at least 10 years.

94.     These representations became the basis of the bargain when Plaintiff purchased the turf field and accepted the replacement turf field.

95.     Plaintiff relied on Defendants' express warranties and representations and would not have purchased the Duraspine turf field, or accepted the replacement field in 2012 if it had been disclosed that the artificial turf did not conform to Defendants' express representations and warranties.

ROBERTSON
& ASSOCIATES, LLP

96.   Defendants' breached their warranties by:

a.   Manufacturing, selling, distributing and installing artificial turf that was defective;

b.   Selling, distributing and installing artificial turf which Defendants knew was defective;

c.   Refusing to honor the express warranty by refusing to replace the defective turf field with a non-defective turf product which would last the full ten year life expectancy of the product;

d.   Failing to replace the end zones and centerfield logo turf areas in 2012, and refusing to replace the alternating light and dark green color turf at five yard intervals in 2012 to match the original installation in 2006;

e.   Replacing the defective artificial turf field with the same defective turf product in 2012, even after Defendants had sued their supplier admitting that the product was defective.

97.   Plaintiff has complied with all conditions precedent and provided Defendants with adequate notice.

98.   Defendants have failed to honor the terms of their express warranty by failing to replace the defective artificial turf field at SYHS with a suitable non-defective turf product which will last for the entire 10+ year expected life of the product, and by failing to replace the defective turf field with the identical color and design of the original field.

99.   Any alleged limitations in the warranty are objectively and subjectively unconscionable. Plaintiff had no opportunity to negotiate any terms due to Defendants' superior bargaining position. Further, any alleged warranty terms are one-sided due to Defendants' knowledge, and are unenforceable. Any alleged disclaimers are not conspicuous, not consented to, and accordingly unenforceable.

100.   As a direct and proximate result of Defendants' misconduct, Plaintiff has suffered damages and continues to suffer damages, including economic damages

ROBERTSON
& ASSOCIATES, LLP

22737.1

31

at the point of sale. Additionally, Plaintiff has either incurred or will incur economic damages at the point of repair in the form of the cost of repair and/or the cost of purchasing a non-defective turf field.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as to each Cause of Action as follows:

1.    For general and compensatory damages in an amount to be proven at trial;

2.    For punitive damages;

3.    For costs of suit;

4.    For reasonable attorneys' fees;

5.    For pre-judgment and post-judgment interest;

6.    For a judicial declaration of the rights and obligations of the parties;

7.    For such further relief as the court may deem proper.

DATED: February 14, 2017          ROBERTSON & ASSOCIATES, LLP

                                                      */ s / Alexander Robertson, IV*

By: _____

Alexander Robertson, IV (SBN 127042)
*arobertson@arobertsonlaw.com*
Mark J. Uyeno (SBN 189063)
*muyeno@arobertsonlaw.com*

WHITFIELD BRYSON & MASON
Daniel K. Bryson (Pro Hac Vice pending)
*dan@wbmllp.com*
Patrick M. Wallace (Pro Hac Vice pending)
*pat@wbmllp.com*

*Attorneys for Plaintiff, SANTA YNEZ VALLEY UNION SCHOOL DISTRICT, a political subdivision of the State of California;*